141 So.2d 799 (1962)
MARY MATTIE MATTHEWS, APPELLANT,
v.
COSSIE S. MATTHEWS, APPELLEE.
No. C-442.
District Court of Appeal of Florida, First District.
May 31, 1962.
*800 William D. Barrow, Crestview, for appellant.
Adams & Henderson, Crestview, for appellee.
RAWLS, Judge.
Appellant wife has appealed from a final decree of divorce entered in favor of the appellee husband and seeks reversal on jurisdictional grounds. She further contends that the decree is not supported by the evidence.
We are basically concerned with the jurisdictional question. The husband was adjudicated a mental incompetent in the State of Virginia in 1955. He "walked out" of the state hospital in 1956 and came to Okaloosa County, Florida, where he has since resided. On August 6, 1960, the County Judge of Okaloosa County entered an order adjudging him to be of sound mind and capable of managing his own affairs. On August 10, 1960, the husband filed his complaint in the instant cause which was attacked by the wife through a motion to dismiss asserting that the court was without jurisdiction to try the cause on the grounds that the husband, having been duly adjudicated an incompetent while a resident of the State of Virginia and not having had competency restored until August 6, 1960, was mentally incapable of changing his domicil; and, therefore, he was not a bona fide resident of the State of Florida as required by law.
The factual background of the marital enterprise is important. Cossie and Mattie Matthews were married in 1924. Their marriage survived many disputes until a final battle on June 15, 1953, culminating in the wife's statement: "I told him if he didn't like the way we was living he might as well get his things and move so when I came that afternoon he had moved." The husband moved out of their dwelling into a new garage that he had built and continued to live there until his adjudication of incompetency in 1955. They engaged in arguments over real estate that had been accumulated in their joint names, and on July 23, 1953, the husband and wife went to an attorney's office at which time the husband signed instruments conveying to her his interest in the property and agreeing to pay $15.00 per week for the support of their minor child. A few days later the husband filed suit in the Circuit Court for the City of Hampton, Virginia, to set aside the conveyance of his interest in the property on the grounds of coercion, persuasion, threats and fraud on the part of the wife and their daughter, and on the further ground that the husband was not mentally responsible at the time of the execution of the instruments.
On September 28, 1955, in an order concluding that the contract and deeds should be set aside, the Virginia Circuit Court made extensive findings of fact, reciting therein several examinations of Cossie by various psychiatrists who testified that he was psychotic on July 23, 1953; that he had for some years suffered hallucinations, delusions of persecutions by his wife and had all the symptoms of an insane person; that there was no reason at that time to institutionalize Cossie but if his problems continued, commitment proceedings should be carried out. Mattie filed a petition for commitment of Cossie on December 5, 1955, and on December 8, 1955, he was adjudicated to be mentally ill by a Virginia Court of competent jurisdiction and committed to the Eastern State Hospital at Williamsburg, Virginia. On December 30, 1955, Mattie was appointed committee to the estate of Cossie.[1] In January of 1956, *801 Cossie "walked out" of the State Hospital at Williamsburg and came to Florida where he has since continuously resided.
Mattie testified that she came to Florida in July of 1958, and told Cossie on that occasion that if "he would sign his right of way to her property, that she would sign for him to sell his [property] and he could go to where he wanted to." Cossie's testimony reflects a good memory of dates, happening of events, and his ability to take care of and provide for himself. A witness in his behalf testified that she had lived across the highway from Cossie for about two years, saw him every day, knew that he had lived in the State of Florida for 3 1/2 years (since 1958), and knew he lived in a back room of Aunt Simey's house (an almost helpless 83 year old woman); that Cossie cooked for and took water to Aunt Simey; and that since she (the witness) had moved to a place 2 1/2 miles from Aunt Simey's, Cossie visited "us" about once a week.
Prior to final hearing the Chancellor, upon Mattie's petition, appointed two psychiatrists, William C. Wilhoit, M.D., and Roger Sherman, M.D., to inquire into Cossie's mental capacity and competency. Dr. Wilhoit's findings were:
"Final Impression: Paranoid state.
"Competency: The patient seems to be competent in all respects except as to matters dealing with his wife who is the frontal figure in his paranoid system.
"Comment: I feel that the patient is capable of managing his affairs except in a union with his wife. Furthermore, I feel that if he formed a partnership or if he were allowed to have a divorce and if he married again, he might encounter the same sort of difficulties with another partner or wife. I furthermore think that nothing would be gained by committing this man to a state hospital as long as he is able to make a satisfactory ambulatory adjustment outside of state hospital walls."
Dr. Sherman's findings were:
"On examination Mr. Matthews is seen as an elderly, co-operative man who appears, on superficial examination, to be in good contact. I found no defect in his memory or intelligence level. He does not suffer from a mood disorder. In my opinion, however, his thinking is quite distorted in connection with his wife. Although I do not have any source of information other than the patient it seems clear that he has abundant paranoid ideas about his wife. I believe that a diagnosis of paranoid state is appropriate. If it be true that he has had paranoid ideas since 1936 it may be that a diagnosis of paranoid type of schizophrenia might be applicable.
"So nearly as I can ascertain Mr. Matthews has made a satisfactory social adjustment since being in Florida over the course of the past five years. Evidently, he is able to make his own living and has handled his affairs capably enough. The fact is however, that he appears to be quite paranoid in connection with his wife and I believe that he is not capable of exercising good judgment in his relationships with her."
The general rule as to incompetents and insane persons is that the court will consider the degree of lunacy in determining the presence of such mental faculty as would allow capacity to change.[2] And it is apparent that one who, after attaining majority, becomes mentally incompetent retains the domicil which he had when he became insane.[3] However, the mere fact that a person is of unsound mind does not necessarily preclude him from changing his state domicil, if he still has lucid intervals, or sufficient mental capacity to elect a new domicil; that the mere appointment of a *802 guardian for an adult, upon the ground that he is non compos mentis, does not necessarily prevent the latter from changing his domicil if he still has sufficient mental capacity sanely to determine upon such course  at least where the guardian does not object.[4]
The leading Florida case applicable to the instant cause is Miller v. Nelson.[5] An extensive recital of facts reflected the establishment of a domicil in Florida by one Otto Zetterlund. During the latter years of his life, Zetterlund became plagued with numerous ailments including senility. His nurse-confidant carried him to numerous places in other parts of the United States for medical treatment, for change in climate, and to separate him from his business activities in Florida. During these travels, in January 1944, a home was purchased for him in California, where he lived until his death in the latter part of August 1945. On January 26, 1944, Zetterlund signed a power of attorney and shortly thereafter was adjudged incompetent by a California Court. In sustaining the lower court's finding that Zetterlund was domiciled in Florida at the time of his death, the Supreme Court stated on page 293 of 35 So.2d that:
"A person of unsound mind does not have the ability to acquire a new domicile. * * * One's mind may be so weak, whether by nature or by extreme age, as to be unable to form a settled intent to change his home and in that case cannot change his domicile."
Consequently, the rule applicable in Florida, is the sufficiency of the person's mental capacity to form an intent to establish a new domicil. Appellant contends that the judicial determination by the State of Virginia finding Cossie to be incompetent precludes his establishing a new domicil until the date of the judicial order determining him to be competent, and relies on Miller v. Nelson, supra. The facts recited therein do not support such a contention, for the court found there that Zetterlund lacked sufficient mental competency years prior to his adjudication as an incompetent. Applying appellant's theory to the Miller case, the conclusion would have been that he had acquired a new domicil in California, that being the situs of the judicial determination of incompetency. Appellant continued to analyze the Miller case and concludes that the court's statement: "He cannot by his own will or act change this domicile until he becomes legally capable by the exercise of his own will. When legally capable it is within his power to change his domicile." stands for authority that "legally" means Cossie could not change his domicil until the date of an order entered judicially finding Cossie to be competent. We do not place such a construction on the word "legally". As used by the Court therein, "legally" meant the mental competency of the person involved to form an intent to change his domicil.
As stated in the Miller case, the domicil of origin is assigned to a person by law and he cannot by his own act or will change same until he is legally capable. That Cossie was domiciled in Virginia at the time he was adjudicated an incompetent is agreed to by both parties. The record plainly shows that Cossie demonstrated his intention to change his domicil from Virginia to Florida in the year 1956 by every act within his power. This record supports the Chancellor's final decree, which refuted the contentions of appellant. Cossie came to Florida in 1956 on his own; his committee did not object; he earned his own living; his neighbor visited with him weekly; his wife who was also his committee visited him in 1958, and offered to exchange conveyances of land with him  so she must have thought him to be competent; the psychiatrists that examined him on his wife's petition found that he should not be placed in an institution; he had sense enough to leave Virginia after his wife had *803 placed him in a mental hospital and acquired control of his property; his memory and comprehension of events transpiring during his adult life is far better than that of many "competent" citizens. Much is said by Mattie as to Cossie's declarations that he was born with a "veil" over his face; that God directed him in his dreams; and that he had a black panther for a friend. In this modern day society, the trend of thought seems to be that every citizen's conduct should conform to a molded pattern. Persons who used to be called "town characters" are now referred to as suffering from various psychotic behaviour patterns. Citizens displaying eccentric behaviour patterns are not necessarily mentally incompetent. After considering all of the evidence in this record, a most apparent fact shines as a navigational star  that Cossie has continuously lived in Okaloosa County since 1956 peacefully with his neighbors, and during this period no concern was evidenced about his sanity until he attempted to sever the marital relationship with his wife in the instant cause. We find that Cossie Matthews had sufficient mental capacity to change his domicil and that he was a bona fide resident of the State of Florida upon the institution of this cause.
As to appellant's point questioning the sufficiency of the evidence to sustain the decree, the facts outlined above clearly reveal lack of any merit in such contention. In addition, a letter written by Mattie to Cossie after her Florida visit in 1958 was before the Chancellor who termed it as "one of the nastiest letters the Court has read recently." We thoroughly agree with the Chancellor as to his comments, and only add that the contents of the subject letter were more than adequate to serve as corroborating evidence to sustain the allegations by Cossie of extreme cruelty and desertion.
Affirmed.
WIGGINTON, Acting C.J., and STURGIS, J., concur.
NOTES
[1] Analogous to guardian of person and property in this jurisdiction.
[2] 8 Fla.Law & Prac., Domicile, § 17.
[3] 17A Am.Jur., Domicil, § 82.
[4] 30 A.L.R. 607.
[5] Miller v. Nelson, 160 Fla. 410, 35 So.2d 288 (1948).